UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

J. CORY CORDOVA                              CASE NO.  6:19-CV-01027

VERSUS                                       JUDGE JAMES D. CAIN, JR.

LOUISIANA STATE UNIVERSITY                   MAGISTRATE JUDGE HANNA
AGRICULTURAL & MECHANICAL
COLLEGE BOARD OF SUPERVISORS,
ET AL.

## MEMORANDUM RULING

Before the court are motions for summary judgment [docs. 54, 65] filed, respectively, by defendants Karen Curry ("Curry") and the Louisiana State University Agricultural & Mechanical College Board of Supervisors ("LSU") (collectively, "LSU defendants") and by defendants University Hospital & Clinics, Inc. ("UHC"), Lafayette General Medical Center, Inc. ("LGMC"), and Lafayette General Healthy System, Inc. ("LGHS") (collectively, "Lafayette General defendants"). Both motions are opposed by plaintiff J. Cory Cordova and have been fully briefed. Oral argument on the motions was heard on December 15, 2020. The court now issues this ruling.

### I.
### BACKGROUND

This suit arises from Dr. J. Cory Cordova's non-renewal from the LSU "house officer" (residency) program at Lafayette General Hospital in Lafayette, Louisiana.

Cordova was non-renewed from the program after one year, after being placed on probation by program director Dr. Karen Curry. Following his non-renewal, he filed suit against Curry, department head Dr. Nicholas Sells, director of graduate medical education Ms. Kristi Anderson, and LSU, as well as the Lafayette General defendants.[1] He alleged, in relevant part, that Curry, Sells, Anderson, LSU, and the Lafayette General defendants violated his right to due process under the federal and state constitutions, in violation of 42 U.S.C. § 1983, and committed a breach of contract by non-renewing him from the house officer program and then sabotaging his efforts to apply to other programs. Doc. 1, att. 2, pp. 192–93.

On Rule 12(b)(6) motions to dismiss filed by the LSU defendants, the court dismissed the breach of contract claims as to the individual defendants and dismissed many of the due process claims, leaving only the substantive due process claim against Curry with the issue of qualified immunity deferred until summary judgment. Accordingly, the only remaining claims against the LSU defendants are the substantive due process claim against Curry and the breach of contract claim against LSU. *See* docs. 30, 43. No motion to dismiss has been brought by the Lafayette General defendants and so no claim against them has been dismissed at this stage.

The remaining LSU defendants now bring a Motion for Summary Judgment, aimed at securing dismissal of Cordova's remaining substantive due process claim against Curry

---

[1] He also named as defendants the attorney and law firm who had represented him through the non-renewal process, alleging that they had operated under an undisclosed conflict of interest. Those claims are still pending.

and breach of contract claim against LSU. Doc. 54, att. 2. To this end they assert that (1) Curry is entitled to qualified immunity for any due process violation; (2) Cordova has not identified a substantive due process property interest or violation thereof by Curry; and (3) Cordova's non-renewal did not breach any term of the House Officer Agreement of Appointment or House Officer Manual. *Id.* Cordova opposes the motion. Doc. 61.

The Lafayette General defendants also bring a motion for summary judgment, asserting that they were not parties to the House Officer Agreement of Appointment and had no authority over or involvement in Cordova's non-renewal. Furthermore, they contend, they cannot be held liable for a due process violation because they are not state actors and did not conspire with the LSU defendants to violate Cordova's rights. In the alternative, the Lafayette General defendants wholly adopt the arguments of the LSU defendants and move for dismissal of all claims against them on those grounds. Doc. 65, att. 1. Cordova opposes this motion as well. Doc. 73.

## II.
### SUMMARY JUDGMENT STANDARD

Under Rule 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party is initially responsible for identifying portions of pleadings and discovery that show the lack of a genuine issue of material fact. *Tubacex, Inc. v. M/V Risan*, 45 F.3d 951, 954 (5th Cir. 1995). He may meet his burden by pointing out "the absence of evidence supporting the nonmoving party's case." *Malacara*

*v. Garber*, 353 F.3d 393, 404 (5th Cir. 2003). The non-moving party is then required to go beyond the pleadings and show that there is a genuine issue of material fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To this end he must submit "significant probative evidence" in support of his claim. *State Farm Life Ins. Co. v. Gutterman*, 896 F.2d 116, 118 (5th Cir. 1990). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249 (citations omitted).

A court may not make credibility determinations or weigh the evidence in ruling on a motion for summary judgment. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). The court is also required to view all evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Clift v. Clift*, 210 F.3d 268, 270 (5th Cir. 2000). Under this standard, a genuine issue of material fact exists if a reasonable trier of fact could render a verdict for the nonmoving party. *Brumfield v. Hollins*, 551 F.3d 322, 326 (5th Cir. 2008).

## III.
### LAW & APPLICATION

### A. LSU Defendants' Motion

#### 1. Prematurity of motion and bad faith affidavits

In his opposition to the LSU defendants' motion, Cordova asserts that the motion should be denied because no discovery has taken place and he did not have access to some of the evidence attached (namely, documents from his personnel file) until the LSU

defendants' motion for summary judgment was filed. Doc. 61, pp. 3–7. He also alleges that the LSU defendants' affidavits, asserting that he had full access to his personnel file throughout his residency, contain patently false assertions. *Id.* at 3–4. Accordingly, he maintains that he is entitled to relief under Federal Rule of Civil Procedure 56(h).

Federal Rule of Civil Procedure 56(d) allows the court to deny or delay ruling on a motion for summary judgment where the nonmovant "shows by affidavit or declaration that, for specified reasons, it cannot present essential facts to justify its opposition[.]" Cordova complains that the LSU defendants have filed another dispositive motion without conducting discovery, but his complaint appears more in the vein of having to defend the suit on the merits for a third time before the completion of discovery.

Trial in this matter was first set for September 21, 2020, by scheduling order dated September 18, 2019. Doc. 16. In April 2020 that trial date was continued at the parties' joint motion, and a new trial date of April 19, 2021, was selected at a scheduling conference the following month. Docs. 46, 51. The dispositive motion deadline under that scheduling order is January 19, 2021, and the LSU defendants filed their motion for summary judgment on October 21, 2020. Doc. 51. Cordova does not allege that he was prevented from conducting discovery during this time period. While the LSU defendants have filed two prior dispositive motions, both were made under Federal Rule of Civil Procedure 12(b)(6) and decided on the pleadings and their attachments. Assuming that the parties have the evidence at their disposal to brief this motion for summary judgment, there is

nothing to prevent the court from ruling on it and no right to relief against the LSU defendants merely because they have already filed other dispositive motions. There is also no justification for delaying consideration of the motion because of plaintiff's failure to propound any discovery up to this point.

As for the affidavits, Rule 56(h) provides:

> If satisfied that an affidavit or declaration under this rule is submitted in bad faith or solely for delay, the court—after notice and a reasonable time to respond—may order the submitting party to pay the other party reasonable expenses, including attorney's fees, it incurred as a result. An offending party or attorney may also be held in contempt or subjected to other appropriate sanctions.

Fed. R. Civ. P. 56(h).

The affidavit at issue here is the one submitted in support of the LSU defendants' assertion that Cordova had access to records referenced in the Request for Adverse Action ("RFAA") that led to his non-renewal. *See* doc. 54, att. 2, pp. 18–19. Cordova has alleged that he requested the exhibits attached to the RFAA but was denied access to these until after he filed his formal response and been notified of his non-renewal. Doc. 1, att. 2, pp. 188–89. In support of the Motion for Summary Judgment, however, the LSU defendants assert that Cordova had electronic access to all records referenced in the RFAA through New Innovations, the LSU School of Medicine's online portal. Doc. 54, att. 3, ¶¶ 53 & 54. To this end they submit an affidavit from defendant Curry, who in turn references portions

of the House Officer Manual describing the records system.[2] Doc. 54, att. 10, ¶ 24; *see* doc. 54, att. 11, p. 29.

Cordova contends that this assertion is "patently false" and contradicts the allegations in his pleadings. Doc. 61, p. 4. He also maintains that the assertions will be disputed by evidence in his control that he intends to submit at trial – namely, the testimony of his former attorney and evidence showing that this attorney requested access to Cordova's personnel file in July 2018, several months after the complained-of events. *Id.* Cordova submits an affidavit in which he maintains that he was never granted access to the exhibits until months after the RFAA process concluded. Doc. 61, att. 3, pp. 1–2. To this affidavit he attaches billing records and correspondence from his former attorney, which include requests for these records, and correspondence between Cordova and Sells from August 2018 regarding his requests to review his personnel file. *See id.* at 7–17.

The fact that Cordova was requesting access to his personnel file in July and August 2018, after his termination from the LSU house officer program, does not contradict defendants' assertion that he had access to the records referenced in the RFAA while still in the program in January and February 2018. Moreover, the fact that the LSU defendants have submitted an affidavit refuting an allegation in the pleading does not show that it is false or made in bad faith. Finally, the LSU defendants also attach to their reply brief

---

[2] Cordova also asserts that former defendants Sells and Anderson submitted bad faith affidavits on this subject, but their affidavits are not cited for the above contention nor do they contain any statement on his ability to access the records referenced in the RFAA. *See* doc. 54, att. 4 (Anderson affidavit); doc. 54, att. 13 (Sells affidavit).

records showing that Cordova's credentials were used to electronically access his personnel data on this system more than 200 times throughout his residency – up to and including his last day, in June 2018 – and that Cordova's credentials were also used to review medical records of patients he had treated during this time, whose encounters were described in the RFAA. Doc. 70, atts. 1–3. They further note that Cordova's response to the RFAA contains multiple admissions that he reviewed the evaluations and medical records referenced. *See* doc. 54, att. 9, pp. 66–70. Cordova has not shown that the statements contained in Curry's affidavit were false or made in bad faith, and at any rate he has not established that they are germane to the surviving substantive due process or breach of contract claims.[3] *See* doc. 41, pp. 7–10 (handling RFAA exhibit allegations under procedural due process claim). Accordingly, he is not entitled to any relief under Rule 56(h).

### 2.  Substantive due process violation and qualified immunity

On the LSU defendants' second Motion to Dismiss, the court established that Cordova can only succeed in his substantive due process claims if he alleges that he was deprived of that interest in a manner so arbitrary that it shocks the conscience. *E.g.*, *Pham v. Univ. of La. at Monroe*, 194 F.Supp.3d 534, 546 (W.D. La. 2016); *Stark v. Univ. of S.*

---

[3] At oral argument plaintiff's counsel asserted that Cordova lacked access to the exhibits in particular, including handwritten notes on these. However, Curry's affidavit only indicates that Cordova had access to the evaluations and medical records that were attached as exhibits to the RFAA. *See* doc. 54, att. 10, ¶ 24. Moreover, the court has reviewed the exhibits to the RFAA, including the minimal handwritten notes. Even if Cordova could show that these were germane to a claim, he could not show that lack of access to these notes impeded his ability to respond in any material way.

*Miss.*, 8 F.Supp.3d 825, 841 (S.D. Miss. 2014). For academic decisions,[4] the plaintiff must allege "such a substantial departure from accepted academic norms as to demonstrate that [the defendants] did not actually exercise professional judgment." *Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 225 (1985). This provides only a narrow avenue for judicial review. *Id.* at 227.

The court proceeded to dismiss the substantive due process claims against the other LSU defendants, but preserved those against Dr. Curry. In so doing the undersigned stated:

> [A] successful claim depends on showing that her evaluations of the plaintiff were so beyond the pale of reasoned academic decision-making as to violate his due process rights. *Wheeler v. Miller*, 168 F.3d 241, 250 (5th Cir. 1999). The court must remain cognizant that it is ill suited to evaluate the substance of academic decisions, which require "an expert evaluation of cumulative information and [are] not readily adapted to the procedural tools of judicial or administrative decision-making." *Ewing*, 474 U.S. at 226. At this stage, however, all the plaintiff need do is allege that Dr. Curry's actions were sufficiently skewed and lacking in professional judgment – a standard he has met through his allegations that she misrepresented witness accounts and violated professional standards in her evaluation process.

Doc. 41, pp. 12–13.

---

[4] At oral argument plaintiff's counsel argued that the non-renewal was a disciplinary decision rather than academic one and thus entitled him to greater due process. *See Shah*, 54 F.Supp.3d at 692 (citing *Bd. of Curators of Univ. of Mo. v. Horowitz*, 435 U.S. 78 (1978)). To this end, he points to his passing cumulative evaluations and the fact that he was non-renewed but successfully completed his first year of residency in the LSU program. As the Southern District of Mississippi recently noted, however, "[i]n residency situations, courts have classified a wide variety of reasons for dismissal as being academic in nature." *Papin v. Univ. of Miss. Med. Ctr.*, 347 F.Supp.3d 274, 280 (S.D. Miss. 2018). These include: (1) poor performance in clinical rotations, *Horowitz*, 435 U.S. at 85–86; (2) failure to comply with mental health staff for her own treatment, *Shaboon*, 252 F.3d at 731; (3) failure to comply with a drug-testing agreement, *Mathai v. Bd. of Sup'rs of La. State Univ.*, 959 F.Supp.2d 951, 959 (E.D. La.), *aff'd*, 551 F. App'x 101 (5th Cir. 2013); and (4) low marks in "professionalism and interpersonal skills," *Shah*, 54 F.Supp.3d at 694–95. *Papin*, 347 F.Supp.3d at 280 n. 5. In contrast, courts have found a student's dismissal to be disciplinary in nature when it was based on allegations of sexual harassment or cheating. *Id.*; *Pham v. Univ. of La. at Monroe*, 194 F.Supp.3d 534, 545 (W.D. La. 2016). Here Cordova's non-renewal was based on professional evaluations of his competencies as a physician in training rather than on the violation of any code of conduct provision. Plaintiff's counsel presents no convincing basis for construing his non-renewal as a disciplinary matter.

Curry now moves for summary judgment on the substantive due process claim, asserting that Cordova cannot meet this high bar. In doing so, she argues that Cordova cannot show a constitutionally protected interest in reappointment. Doc. 54, att. 2, pp. 10–16. But the court already addressed this issue on the LSU defendants' second Motion to Dismiss, noting:

> In the due process context, medical residents are treated as students rather than employees of the hospital. *Ekmark v. Matthews*, 524 F. App'x 62, 63–64 (5th Cir. 2013). The Supreme Court and Fifth Circuit have generally assumed that students of public universities have a protected interest in continuing their education. *Shah v. Univ. of Tex. S.W. Med. Sch.*, 54 F.Supp.3d 681, 691 (N.D. Tex. 2014). Medical residents occupy a less defined status and may not have a protected interest when it is understood that they can be dismissed without cause. *See Shaboon v. Duncan*, 252 F.3d 722, 732 (5th Cir. 2001). Where, however, their contracts grant them an expectation in renewal and a grievance procedure to address dismissals, courts generally find or at least assume that they have a protected interest in their status. *E.g.*, *Davis v. Mann*, 882 F.2d 967, 972–73 (5th Cir. 1989); *Papin v. Univ. of Miss. Med. Ctr.*, 347 F.Supp.3d 274, 280 (S.D. Miss. 2018).

Doc. 41, p. 5. The court then found that the House Officer Agreement and House Officer Manual (attached to Cordova's complaint) supported such an interest. *See id.* at 4–6. The LSU defendants present no new evidence and no basis for revisiting that determination, much less obtaining judgment as a matter of law on it.

As for the alleged violation, the court turns to Curry's arguments on the qualified immunity issue. This doctrine "protects government officials from suit and liability for civil damages under § 1983 insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Shah*,

54 F.Supp.3d at 690. To support such a claim, the defendant must assert the defense and demonstrate that she is a government official whose position involves the exercise of discretion. *Thompson v. Uphsur Cnty., Tex.*, 245 F.3d 447, 456 (5th Cir. 2001). The burden then shifts to the plaintiff to rebut the defense. To this end he must show (1) that the official violated a statutory or constitutional right and (2) that the right was "clearly established" at the time of the challenged conduct. *Id.* "To avoid summary judgment on qualified immunity, the plaintiff need not present absolute proof, but must offer more than mere allegations." *Melton v. Phillips*, 875 F.3d 256, 261 (5th Cir. 2017) (internal quotations omitted). Because plaintiff is the non-moving party, however, all facts and inferences are construed in the light most favorable to him. *Id.*

There is no dispute that Curry has raised qualified immunity as a defense or that she is a state actor whose role involves the exercise of discretion. Accordingly, the burden shifts to Cordova to show that she violated a constitutional right and that this right was clearly established at the time of the event. Once again, Cordova must show that Curry's evaluations of him were sufficiently "beyond the pale of reasoned academic decision-making" in order to succeed on his substantive due process claim.

In his complaint Cordova alleged that Curry was not objective in her assessments of him. He showed that two faculty members listed in the RFAA as witnesses to his alleged incompetence actually wrote glowing letters of recommendation on his behalf. He also provided other letters of recommendation and an affidavit from a clinical manager in the

emergency department, the latter of whom expressed surprise at his dismissal and compared him favorably to other residents. Doc. 1, att. 2, pp. 36, 49–55. On review of the complaint and these attachments, the court determined that the allegations of animus and misrepresentation of witness accounts were sufficient at the 12(b)(6) stage to show a possible substantive due process violation. Cordova, however, has come forward with nothing else to support his allegations. While the court will construe disputed issues of fact in his favor, it is his burden upon the raising of a qualified immunity defense to "offer more than mere allegations." *Melton*, 875 F.3d at 261. In other words, Cordova "must point to specific evidence in the record demonstrating a material fact issue on each element of his clam." *Mitchell v. Mills*, 895 F.3d 365, 370 (5th Cir. 2018).

Cordova has produced letters of recommendation written after the RFAA by two physicians, Dr. Mathew Whittington and Dr. Ali Sadeghi, who were each listed by Curry as a witness to an alleged instance of deficient professional behavior. *See* doc. 1, att. 2, pp. 36–38 (RFAA); *id.* at 50–52 (letters of recommendation). Whittington was listed as one of three physician witnesses to an incident on November 10, 2017, where Cordova failed to answer pages from the emergency room. *Id.* at 36. In addition to a letter of recommendation praising Cordova's clinical skills, Whittington also provided a letter dated after the RFAA in which he stated that he had tried to page Cordova on the date in question but that at the time of the encounter they were having "problems with the operators having difficulty accurately paging residents" and that he therefore called Curry to pass along the patient's

information to Cordova. Doc. 1, att. 2, p. 52. He then reiterated his praise for Cordova and noted that, in his experience, he had always responded quickly to all pages. *Id.*

In the attachments to the RFAA, which are provided in the complete resident file submitted by LSU defendants, Curry supports this incident with the patient's record and with emails exchanged around the time. On the patient's record Whittington has recorded that he is "currently trying to contact the patient's primary care physician, Dr. Cordova" and Curry records in a handwritten note that Whittington subsequently contacted her to inform her that Cordova had not answered his page. Doc. 54, att. 8, p. 97. The emails contain discussion of the incident between Curry and Cordova, beginning one week later, with Cordova describing his follow-up and his confusion about the proper procedure, since he was on another rotation at the time, and Curry reiterating that the main concern was that the ER could not reach him. *Id.* at 98–100. Curry also forwarded the messages to faculty member Dr. Farha Khan, who confirmed that she spoke with Cordova and had tried to explain "that while it's true he was on an off site rotation- it's polite and courteous to recall the call/text/page from the ER." *Id.* at 99.

Meanwhile, Dr. Ali Sadeghi was listed as a witness to an instance of untruthful behavior. Doc. 1, att. 2, p. 38. The incident is described as follows by Dr. Curry in the RFAA:

> During the clinical competency meeting on 1/5/18 Dr. Borrero discussed the inconsistencies in Dr. Cordova's claim that Dr. Sadeghi was going to write up Dr. Yasin (his upper level resident) for unprofessional behavior. In fact Dr. Sadeghi had been out on sick leave and had not worked

with Drs. Yasin or Cordova. I confirmed with Dr. Sadeghi that he did not
intend to write Dr. Yasin up.

*Id.* The alleged write-up related to another instance described in the RFAA, in which Dr.

Cordova falsely accused Yasin of ordering him to perform an unnecessary rectal

examination. *See id.* Dr. Sadeghi also provided a letter of recommendation for Cordova,

rating him very highly based on his one-month emergency medicine rotation and stating

that Cordova was likewise esteemed by other members of the team. *Id.* at 50.

The letters at issue do not directly contradict Curry's presentation of either incident,

nor has Cordova provided any further statement from these individuals. While Whittington

asserted after the RFAA was written the Cordova was unreachable due to operator issues,

the patient record and email exchanges corroborate Curry's account and there is no

evidence that Whittington or anyone else presented the account raised in his letter to her

before the RFAA. Additionally, the only information apparently given by Sadeghi in

support of the RFAA was that he was on sick leave at the time and did not intend to write

up Yasin. It is unclear whether he knew the extent of the dispute at the time of the RFAA

or when he subsequently wrote his letter of recommendation in support of Cordova, but

neither account contradicts the other. Finally, the RFAA describes eleven other instances

of deficient performance in the areas of patient care, medical knowledge, interpersonal and

communication skills, and professionalism. Doc. 1, att. 2, pp. 36–39. In addition to Curry's

own assessments, these are supported by medical records, evaluations and statements from

medical faculty and staff who worked with Cordova, and communications with Cordova.[5] *See generally* doc. 54, atts. 8 & 9. The fact that other doctors and nurses provided letters of recommendation supporting him and/or gave him positive reviews on different rotations does not create an issue of fact as to the accuracy or objectivity of any of the assessments involved or Curry's own professional judgment. Moreover, this evidence shows that Cordova's non-renewal was the kind of academic/professional decision to which reviewing courts show great deference. *See Shah*, 54 F.Supp.3d at 697 (collecting cases).

The fact that "reasonable minds could disagree on the propriety of [the plaintiff's] termination is insufficient to defeat a public official's qualified immunity against a substantive due process claim." *Lewis v. Univ. of Tex. Med. Branch at Galveston*, 665 F.3d 625, 631 (5th Cir. 2011) (internal quotations omitted). Cordova has failed to show anything more than a range of opinions regarding different areas of his competencies among the various medical professionals with whom he worked during his one-year term. None of the evidence introduced, even when drawn in a light most favorable to him, meets the high bar of showing that Curry's assessment was so arbitrary and lacking in professional judgment as to shock the conscience. Accordingly, he has failed to meet his burden on the qualified immunity defense of establishing a constitutional violation and the substantive due process claim against Curry must be dismissed.

---

[5] At oral argument plaintiff's counsel placed special emphasis on a cumulative assessment in his personnel file in January 2018. *See* doc. 54, att. 8, p. 63. Neither this nor other positive evaluations call into question the soundness of Dr. Curry's judgment based on observed deficiencies in his competencies, as supported by the witness accounts and medical records in the thirteen specific incidents described above.

### 3.  Breach of contract

Finally, the LSU defendants seek summary judgment on Cordova's breach of contract claim. Cordova brings this claim based on the due process terms of the House Officer Manual ("HOM"), as incorporated into the House Officer Agreement of Appointment ("HOAA") under which he was appointed to a one-year term from July 2017 through June 2018. Doc. 1, att. 2, p. 193; *see* doc. 7, att. 2. The HOAA provides that an appointment can be terminated at any time for cause, and that "[c]onditions for re-appointment and non-renewal of the contract are discussed in the [HOM]." *Id.* at 5. Finally, it notes that promotion to a subsequent program year/renewal of the appointment is "expressly contingent upon several factors," including satisfactory performance and the availability of positions. *Id.* The HOM classifies non-renewal as an adverse action, which may be taken for cause. Doc. 7, att. 3, p. 11. The HOM further provides certain procedural guarantees when non-renewal or termination is contemplated. *Id.* at 11–14.

On the second motion to dismiss, the court found no breach of the HOAA or HOM based on Cordova's assertion that the LSU defendants had ignored his untimely appeal. Doc. 41, pp. 15–16. It allowed this claim to survive, however, as to Cordova's assertion that the LSU defendants had violated an HOM requirement that an RFAA contain a summary of each witness's expected testimony, because the LSU defendants had failed to address the allegation as a possible breach. *See id.* The LSU defendants now address the

allegation and seek summary judgment, maintaining that the RFAA was sufficiently thorough and complied with the terms of the HOM.[6] Doc. 54, att. 2.

The relevant provision is found within the Due Process section of the HOM and states:

> Recommendation for dismissal, non-reappointment, non-promotion, or other adverse action that could significantly threaten a House Officer's intended career development shall be made by the Program Director in the form of a Request for Adverse Action. The **Request for Adverse Action** shall be in writing and **shall include proposed disciplinary action, a written statement of deficiencies and/or charges registered against the House Officer, a list of all known documentary evidence, a list of all known witnesses and a brief statement of the nature of testimony expected to be given by each witness.**

Doc. 7, att. 3, pp. 11–12 (emphasis in original).

---

[6] In his opposition Cordova reasserts several other allegations under the breach of contract claim, but only references the HOAA or HOM under one of these – Curry's alleged failure to consult the Clinical Competency Committee regarding the recommendation of non-renewal in her RFAA, "as required by the HOM and the ACGME [Accreditation Counsel for Graduate Medical Education]." Doc. 61, p. 3. To this end Cordova appears to be drawing from a statement in the HOM that "[e]ach [d]epartment has established policies for House Officers that will be consistent with the ACGME General Requirements and Special Requirements of each program" and a statement that "[e]valuation of House Officers will follow the ACGME requirement for evaluations." Doc. 7, att. 3, pp. 9–10. The HOM further states that, "**[e]xcept where specifically described herein,** house officers in regular training programs who successfully complete training during a year would normally be promoted to the next training level." *Id.* at 10 (emphasis added). Cordova fails to show how this provision became part of the HOM's due process requirements, and his only breach of contract claim relates to the latter section. *See* doc. 1, att. 2, p. 193. Additionally, the HOM provides several specific bases for non-reappointment and other adverse action – including unsatisfactory performance, unprofessional conduct, and conduct detrimental to patient care – apart from successful completion of the year under the ACGME rubric. Doc. 7, att. 3, p. 11.

Cordova also complains under this section of lack of access to the exhibits attached to the RFAA. But as defendants note, the only time the HOM requires supporting documentation to be sent to the resident is when a hearing is convened on his appeal of the department head's decision on an RFAA. *See* doc. 7, att. 3, p. 13. The court has already determined that Cordova failed to timely invoke his appeal rights. Doc. 41, p. 9. Accordingly, even if there is a genuine issue of fact as to Cordova's access to personnel files and patient records referenced in the RFAA or to the form those records took when they were attached as exhibits to the RFAA, it is not germane to the breach of contract claim.

-17-

The RFAA is a four-page document with dozens of pages of exhibits. Doc. 1, att. 2, pp. 36–39; *see* doc. 54, att. 8, pp. 90–200; doc. 54, att. 9, pp. 1–35. As noted above, it describes thirteen total instances of deficient performance in the areas of patient care, medical knowledge, interpersonal and communication skills, and professionalism. Each incident is described with particularity and references at least one witness, usually along with record exhibits. Often the witness's exact anticipated testimony can be gleaned from the incident description.[7] Three incidents, however, reference multiple witnesses and the expected testimony of one of these is not directly summarized.[8]

---

[7] The following examples are illustrative:

**3. Delay in submitting progress notes.** During the Clinical Competency Meeting on 1/10/2017: Dr. Borrero reported notes are not submitted in a timely manner.
**Witness:** Elizabeth Borrero, M.D.
. . . .
**5. Plan to discharge a patient on inappropriate medications.** Dr. Jacob reported that Dr. Cordova blindly checked off all medications to be continued at home without noticing many of those medications had been changed during the patient's hospitalization. The medications he had checked off to continue were both Levothyroxine and Methimazole which are counteractive, as well as both an ACE inhibitor and an ARB.
**Witness:** Greg Jacob, M.D.
**Evidence:** EMR 2670262 (Date of Discharge 1/4/18)
Doc. 1, att. 2, p. 37.

[8] This is the case with respect to the following incidents:

**1. Failure to admit error in medical knowledge.** I reviewed several History and Physicals during the rotation on night float in December.
Issue pointed out to resident during meeting with him Dec. 19 include giving anticoagulation to patient with recent GI bleed and suspected Dieulafoy's lesion requiring transfusion. When I pointed this out, Dr. Cordova said, "That was not my order." When I reviewed the history and physical again, I did notice that the Lovenox was documented in his plan of care.
**Witnesses:** Samiya Yasin, M.D., Karen Curry, M.D.
**Evidence:** EMR MR# 193312. Copy of record labeled "Exhibit E."
. . . .
**1. Failure to answer a page from the Emergency Room for a week.** Incident filed on the day resident was placed on probation (November 10, 2017). Dr. Cordova met with Dr. Khan on multiple occasions concerning this infraction. She informed him even though he was on an outside rotation he needed to answer pages from our Emergency Room. This call was in regards to one of his clinic patients who left AMA with a subdural hematoma. The patient then went to Pulmonary Clinic where Dr. Broussard addressed the patient's needs.
**Witnesses:** Brad Broussard, M.D., Farha Khan, M.D., Matt Whittington, M.D.

The LSU defendants maintain, nonetheless, that there is no breach of the HOM's requirement in this regard because each witness is attached to a specific incident, the incidents are grouped under four general areas of deficiency, and their anticipated testimony can be gleaned from the incident description and categorization. The court is inclined to agree. Each witness can be expected to testify about the specific incident under which he or she is listed. Plaintiff fails to show that the plain language of the HOM requires anything more. Accordingly, the breach of contract claim should be dismissed with prejudice as to all LSU defendants.[9]

## B. Lafayette General Defendants' Motion

Finally, the Lafayette General defendants move for summary judgment on the grounds that they were not a party to the HOAA or HOM and that they did not coordinate, supervise, or evaluate Cordova's performance during his residency. Doc. 65, att. 1. They also assert that they are not state actors and did not conspire with state actors, and so cannot be held liable under § 1983. *Id.* In the alternative, they adopt the LSU defendants'

---

**Evidence:** Attached copy of Emergency room visit, EMR 3145299, Copy of Emails labeled "Exhibit A."

. . . .

**2. Untruthful behavior.** During the clinical competency committee meeting on 1/5/18 Dr. Borrero discussed the inconsistencies in Dr. Cordova's claim that Dr. Sadeghi was going to write up Dr. Yasin (his upper level resident) for unprofessional behavior. In fact Dr. Sadeghi had been out on sick leave and had not worked with Drs. Yasin or Cordova.

**Witnesses:** Elizabeth Borrero, M.D., Ali Sadeghi, M.D., Farha Khan, M.D.

Doc. 1, att. 2, pp. 36–39. In the second, the relationship between Whittington and the incident – and, thus, his expected testimony – can be determined from the referenced medical record. *See* doc. 54, att. 8, p. 97. As for the first and third, however, it is unclear what the exact relationship between Khan and Yasin is with the respective incidents.

[9] On the first motion to dismiss, the court dismissed this claim without prejudice as to the individual LSU defendants because plaintiff failed to allege that they had exceeded their authority as mandataries (agents) of LSU. Docs. 29, 30. Now that they have shown no merit to the claim, the court will dismiss it with prejudice.

arguments on the merits of each claim. *Id.* Cordova opposes the motion, arguing that genuine issues of fact remain as to the Lafayette General defendants' role in the house officer program and in his non-renewal.[10] Doc. 73.

The amended complaint contains no distinct allegations against the Lafayette General defendants. Instead, they are lumped in with the LSU defendants and broadly charged with the same breach of contract and constitutional violations. As this court noted in ruling on the LSU defendants' second Motion to Dismiss, vicarious liability cannot support a claim under § 1983. *Hampton v. Oktibehha Cnty. Sheriff Dep't*, 480 F.3d 358, 365 (5th Cir. 2007). Instead, only the direct actions or omissions of government officials will give rise to individual liability for a constitutional violation. *Alton v. Tex. A&M Univ.*, 168 F.3d 196, 200 (5th Cir. 2000). There is no allegation of any direct action or omission by the Lafayette General defendants with regards to Cordova's non-renewal. Accordingly, even if he could show that they were state actors or conspired with state actors and that they played a role in the RFAA process, he has asserted no basis for their liability under § 1983. These claims must be dismissed with prejudice.

As for the breach of contract claims, these arise from the HOAA and HOM described above. The HOAA was signed by Cordova, LSU defendants Curry and Sells in

---

[10] In his statement of material facts, Cordova also raises an objection "to the extent that the majority of the 'Uncontested Material Facts' are inaccurate, incorrect, conclusory, and are the Defendants' interpretation of the facts" and further requests relief under Federal Rule of Civil Procedure 56(h) to the extent that the court finds that the declarations submitted by the defendants were submitted in bad faith. Doc. 73, att. 1, p. 1. Cordova does not demonstrate any specific instance of falsity, let alone demonstrate the bad faith needed to obtain relief under Rule 56(h). Accordingly, the court declines to search the record for evidence in support of his conclusory allegations.

their respective capacities as program director and department head, and by James Falterman in his capacity as "Associate Dean of Academic Affairs." Doc. 7, att. 2, p. 8. Falterman is identified as an employee of the Louisiana State University School of Medicine in both the HOAA and the Agreement of Affiliation between LSU and LGMC. *Id.* at 1; doc. 65, att. 7, p. 26. While the HOAA describes the program as being located at UHC, it is also specifically designated as an agreement between Cordova and LSU. Doc. 7, att. 2, p. 1. Further, the HOM – whose due process terms the defendants are specifically alleged to have breached – makes no mention of any of the Lafayette General defendants and instead appears to only set forth policies governing all residency programs affiliated with the LSU School of Medicine. *See* doc. 7, att. 3.

In response, Cordova notes various terms of the UHC Code of Conduct and other documents which he alleges support the involvement of the Lafayette defendants in his training, evaluation, and non-renewal. At issue in his breach of contract claim, however, are the HOAA and HOM. The terms of those agreements show that they were only binding on Cordova and the LSU defendants. Accordingly, there is no basis for holding the Lafayette General defendants liable under the breach of contract claim raised.

In his response Cordova attempts to resurrect the due process claims based on allegations that Curry misrepresented the evaluations in his personnel file to another program and new allegations that (1) Falterman was the actual department head and should

have reviewed the RFAA instead of former defendant Dr. Nicholas Sells,[11] and (2) the proceedings also failed to comply with fair procedure requirements of the Lafayette General defendants' Code of Conduct. *Id.* Finally, he argues that a Louisiana Supreme Court case, *Driscoll v. Stucker*, 893 So.2d 32 (La. 2005), shows that his constitutional interest in continuing in the program was well-established and defeats Curry's qualified immunity defense on the second prong. *Id.*

On the due process claim arising from communication with other programs, the court addressed the allegations in ruling on the second motion to dismiss with the following:

> As for the claim relating to disclosure of information to other programs, there is no "constitutional protection for the interest in reputation." *Siegert v. Gilley*, 500 U.S. 226, 234 (1991). While students are generally found to have an interest in continuing their education, it is well-established that applicants do not have a protected interest in admission to a program. *Tobin v. Univ. of Me. Sys.*, 59 F.Supp.2d 87, 90 (D. Me. 1999) (collecting cases). A plaintiff may show significant reputational harm if he alleges that the damage served as a complete bar to continuing his training. *See Cadet v. Bonbon*, 2006 WL 8205989, at *3 (D. Mass. Aug. 1, 2006) (citing *Greenhill v. Bailey*, 519 F.2d 5, 7 (8th Cir. 1975)). But all that is alleged here is that the plaintiff's prospects at two other programs were harmed. Accordingly, these allegations may support a tort claim but do not give rise to a substantive due process violation. The court will dismiss this motion without prejudice, however, and allow the plaintiff to reassert it if he can show greater harm to his education prospects than what was alleged here.

---

[11] Falterman was designated as the Associate Dean of Academic Affairs in the HOAA but as the "Head, Department of LSU Health-Lafayette School of Medicine in New Orleans" in a service agreement contained within the Affiliation Agreement between LSU and LGMC. *Compare* doc. 7, att. 2, *with* doc. 65, att. 7, pp. 24–26.

Doc. 41, pp. 11–12. Cordova makes no such showing; he alleges that Curry sent negative evaluations to a program but does not contend that he was unable to continue his medical training as a result. *See* doc. 73, pp. 13–14. Instead, his focus seems to be whether Curry intentionally misrepresented his evaluations. That is not the standard here and the new allegations present no basis for reopening the claim. Furthermore, because Cordova has failed to come forth with any evidence of sufficient harm, the court will dismiss this claim with prejudice as to all defendants.

As for the new allegations relating to Dr. Falterman, Cordova argues that these justify both reconsideration of the court's dismissal of the breach of contract claims as well as reconsideration of the procedural due process claim. To this end the allegations are not properly before the court. Falterman is an LSU employee and the allegations against him do not support any of the claims remaining against the Lafayette General defendants. Additionally, defendants indicated at oral argument that they dispute Cordova's contention regarding Falterman's role though they have not yet had the opportunity to formally oppose it. Cordova should have filed a motion for leave to amend and/or motion to reconsider to allow proper briefing on the issue if he believes it will revive a dismissed claim or allow for a new cause of action.

Finally, as Cordova notes, the court denied the motion to dismiss on qualified immunity grounds after finding that Cordova satisfied the first prong of the analysis under Rule 12(b)(6) by showing a possible constitutional violation. Doc. 41, pp. 13–14. It

allowed, however, that the allegations were too vague to reach a conclusion on plaintiff's ability to satisfy the second prong (whether the right was clearly established at the time of the offense) and deferred a ruling pending further factual development. *Id.* On the LSU defendants' motion for summary judgment, however, Cordova's burden increased and the court found that Curry was entitled to qualified immunity based on Cordova's inability to point to more than mere allegations concerning Curry's alleged due process violation. As determined supra, the LSU defendants have supported the integrity of the process by providing the RFAA and the evidence on which it was based. The Louisiana Supreme Court decision supplied, showing that a medical resident's constitutional interest in continuing his education might be clearly established, does not undermine this conclusion.

Cordova brought identical claims of breach of contract and constitutional violations against the Lafayette General defendants and LSU defendants. For the reasons described above, this court's finding of no merit as to the LSU defendants inures to the benefit of the Lafayette defendants. Accordingly, the Lafayette General defendants' Motion for Summary Judgment should be granted and all claims against them dismissed with prejudice.

## C.  Entry of Final Judgment Under Federal Rule of Civil Procedure 54(b)

Finally, dismissal of the remaining claims against the LSU and Lafayette General defendants will not bring this action to a close because Cordova's claims against his former attorney and law firm remain pending. Under Federal Rule of Civil Procedure 54(b),

however, the court may direct entry of a final judgment "as to one or more, but fewer than all, claims or parties" if it "expressly determines that there is no just reason for delay." This ruling disposes of all claims against the LSU and Lafayette General defendants, which are distinct from Cordova's malpractice claims against his former attorneys. The court will grant the parties additional time to submit responses on whether the judgment attached to this ruling should be certified as immediately appealable.

## IV.
### CONCLUSION

For the reasons stated above, the Motions for Summary Judgment [docs. 54, 65] will be **GRANTED** and all remaining claims against the LSU defendants and the Lafayette General defendants will be **DISMISSED WITH PREJUDICE**. Furthermore, the court's prior judgments [docs. 30, 43] dismissing the breach of contract claims and substantive due process claims as to certain defendants without prejudice will be amended to reflect that those claims are now **DISMISSED WITH PREJUDICE**. The parties will be given until December 28, 2020, to submit briefs on whether this judgment should be certified as final under Federal Rule of Civil Procedure 54(b).

**THUS DONE AND SIGNED** in Chambers on this 17th day of December, 2020.

**JAMES D. CAIN, JR.**
**UNITED STATES DISTRICT JUDGE**